[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
After almost 12 years of marriage and the birth of three children, the parties to this dissolution action separated in January of 1995 when the plaintiff, Mr. Steele, relocated to Texas in connection with a business venture he was pursuing there after having been laid off by the Travelers. Their marriage had effectively broken down, at the latest, by the summer of 1994. They are at issue over the causes of the breakdown of their CT Page 12716 marriage, insofar as those causes may affect the court's financial orders, the distribution of the property they have acquired during the marriage, Mr. Steele's continuing obligation to support Mrs. Steele, the defendant, and the maintenance of Mr. Steele's extensive contacts with their children, given his residence in Baltimore and his obligation to provide sufficient support for the children and Mrs. Steele here in Connecticut.
Michael and Kimberly Steele were married on May 28, 1983. They have three sons issue of their marriage, whose ages are five, seven and nine. The children reside with Mrs. Steele in Simsbury; Mr. Steele travels from Baltimore to a second residence he maintains in Connecticut each weekend, and the boys spend the weekends with him there.
Mr. Steele is 41 years old; his health is good, and he is the chief executive officer of Elderhealth, a newly-formed company to provide health services to the elderly. His annual salary in this position is $170,000, which nets him $2039 weekly. This is his only source of income. Mr. Steele is a college graduate with extensive executive experience, which should stand him in good stead in terms of a continued high earning capacity. In today's corporate world, however, while his immediate future seems bright, there is an inevitable element of insecurity, as he experienced in 1994-95, when he was laid off from the Travelers and had great difficulty finding reemployment.
Mrs. Steele is 38 years old, and her health has not been good. In January of this year she underwent a mastectomy due to breast cancer; at the time of trial she was engaged in a program of breast reconstruction surgery. In addition, she had had some pre-cancerous growths removed from her back. Finally, she anticipated surgery on her back in the near future to correct a long-standing problem. She has not worked outside the home for the past ten years, leaving her employment when she was pregnant with the parties' first child. Her only source of income, therefore, is the alimony and child support payments she receives from Mr. Steele. During the pendente lite stage of this action those have totaled $1,127 weekly. While Mrs. Steele is a college graduate, she has been absent from the work force for ten years, she has the care of three small children, and she has recently experienced some very serious health problems. Therefore, her ability to capitalize on any earning capacity she may have will be delayed for at least the next two to three years, until her children are older and her health more secure. CT Page 12717
Between them the parties have assets totaling $523,536. In 1986, three years after the parties married, Mr. Steele realized a profit of $550,000 on stock options which he acquired in the company for which he worked shortly before the parties married. He makes no claim to exclude these funds from the marital estate; indeed, it would appear that the major portion of these funds has been utilized by the parties during their marriage for various purposes or by Mr. Steele, himself, to pursue employment or investment opportunities. Therefore, the court will consider that all of the assets subject to distribution are marital assets.
On her financial affidavit submitted at the time of trial Mrs. Steele showed liabilities of $7,000, excluding funds owed to her attorney. Mr. Steele's affidavit of the same date listed liabilities of approximately $10,000, also excluding his counsel fees to that point.
The court has considered all of the criteria of Sections46b-62, 46b-81, 46b-82 and 46b-84 of the General Statutes, together with the applicable case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account", Scherr v.Scherr, 183 Conn. 366, 368 (1981), this court will not recount those statutory criteria and the evidence, other than as stated subsequently in this memorandum. "The court is not obligated to make express findings on each of these statutory criteria." Weiman v. Weiman, 188 Conn. 232, 234 (1982). Suffice it to say that the court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding, Leo v. Leo, 197 Conn. 1, 5 (1985), and need not give equal weight to each factor. Kane v.Parry, 24 Conn. App. 307, 313-14 (1991).
As is customary in these cases, each party expended considerable effort attempting to persuade the court that the other party's conduct was the cause of the breakdown of their marriage. In particular, Mrs. Steele argued that an adulterous relationship on Mr. Steele's part was the sole cause of the breakdown. Whether or not Mr. Steele engaged in such a relationship with a colleague at Travelers the court will never know. Suffice it to say that the evidence introduced by Mrs. Steele of such a relationship was far short of what would be necessary to raise such a conclusion on the court's part beyond the realm of speculation. "Adultery . . . requires proof that the CT Page 12718 other spouse has engaged in extramarital sexual relations . . . . Although, because of their clandestine nature, adulterous acts are usually proved by circumstantial evidence, . . . the circumstances must be such as to lead the guarded discretion of a reasonable and just person to the conclusion of guilt."Turgeon v. Turgeon, 190 Conn. 269, 278 (1983). The court cannot reach that conclusion here. Nor can the court confidently say that any acts of Mrs. Steele caused the breakdown of the marriage. Each party made his and her own contributions; therefore, the court's financial orders will not be based in any part on this factor.
Mr. Steele's earning capacity is far greater than any Mrs. Steele can expect to attain. Moreover, Mrs. Steele will be unable to exploit whatever earning capacity she may have for at least a few years due to her child care responsibilities and her recent and serious health problems. Finally, those health problems cast a shadow over Mrs. Steele's long-term earning capacity and lead the court to conclude that Mr. Steele bears a continuing responsibility to support Mrs. Steele for his or her lifetime or until she remarries. The extent of his obligation, however, will be substantially affected by the court's distribution of the parties' assets. Therefore, that subject will be taken up next.
Mr. Steele has made very substantial financial contributions to the parties' accumulated assets, and he has made a non-financial contribution as well in his demonstrated commitment of time and effort to the raising of the parties' children. Mrs. Steele has made similar and, in the court's opinion, equivalent contributions to the accumulation of these assets. The Appellate Court's decision in O'Neill v. O'Neill, 13 Conn. App. 300,311 (1988), was an early recognition of the fact that work at home is, first of all, work, and it has recently been recognized that this form of work has not only non-financial but very distinct financial implications for the marital unit's well-being. See K. Silbaugh, "Turning Labor into Love: Housework and the Law", 91 Northwestern U.L. Rev. 1, 17-21, 57-58 (1996). Another factor which the court must consider in distributing the property of the parties is that Mr. Steele has a greater ability to acquire assets in the future than Mrs. Steele due to his much higher earning capacity and his familiarity with the business and economic world, gained while Mrs. Steele has been at home caring for the parties' home and children. The court cannot overlook, finally, the fact that, while this action was pending, Mr. Steele has made extensive use of the marital assets for the CT Page 12719 purposes of paying counsel fees in this action and of making an investment in his present business venture. Based on the testimony heard, the court finds that the amount of marital assets so used by Mr. Steele was approximately $193,000.[1]
For all these reasons the court concludes that the assets of the parties, which have been previously valued by the court at $523,536, should be distributed in an unequal fashion, with Mrs. Steele receiving 60% of those assets or $314,000 and Mr. Steele receiving 40% of the same assets, or $209,000. This distribution will be effected in the manner shown in the following table.
Asset Mr. Steele Mrs. Steele Total Elcy Way proceeds $77,737 $77,737
Condo proceeds 19,530[2] 19,530
Vehicles 30,750 9,000 39,750
Life Insurance 3,000 3,000 (CSV)
Schwab Money 69,538 69,538 Market Accounts
Elderhealth Stock 59,234 59,234
Times Publishing 22,586 22,586 Account
Travelers 401K 106,924
Equicor 401K 116,430 115,731 55,335
Schwab IRA's 51,209
First Interstate 18,693 IRA
TOTAL $209,414 $314,122 $523,536
This asset distribution has a profound effect on Mr. Steele's continuing obligation to support Mrs. Steele and their children. For example, Mrs. Steele would have sufficient liquid assets to make a 50% down-payment on a house with a fair market CT Page 12720 value of $175,000, leaving $87,500 to finance. Taking judicial notice of the standard interest rate tables, the court concludes that, over 30 years, at a fixed rate of 7 1/4%, the principal and interest charge on such an investment would be $614 per month versus the almost $1500 per month she now pays for rental premises. This would reduce her weekly expenses by approximately $200. The court further finds that the present amount of her reasonable and necessary weekly expenses is $1200 per week, adjusting some of the expenses shown on her financial affidavit similar more reasonable amounts and adding the COBRA cost of health insurance for Mrs. Steele. The effect of a home purchase similar to that described above is to reduce her weekly expenses to a figure approaching the amount suggested by Mr. Steele in his proposed orders, i.e., $900 per week in combined alimony and child support[3], and this does not take into consideration the income which might be generated by way of Mrs. Steele's investments of the remaining liquid assets.
Taking all of these factors into consideration, as well as the tax consequences to the parties, the court concludes that an unallocated award of alimony and child support should be ordered in the amount suggested by Mr. Steele. Such an order would seem both to meet Mrs. Steele's and the children's financial needs and, according to Mr. Steele's overall proposal, permit him to continue the same expansive contact with the children which he has maintained while this action has been pending.
Finally, Mrs. Steele requests and Mr. Steele resists a contribution by him to her counsel fees. As has been pointed out earlier, however, Mr. Steele has used marital assets extensively to pay his own counsel fees in the amount of $84,000. The court has reviewed the affidavit of counsel fees supplied by Mrs. Steele's attorney at the close of evidence in this case and finds both the hourly rate and the amount of time expended to be reasonable. It seems only fair and equitable for Mr. Steele to make a substantial contribution to those fees, and the court's orders will reflect this consideration.
The court finds that it has jurisdiction, that the allegations of the complaint are proven and are true, and that the marriage has broken down irretrievably. Based on those findings, as well as the court's consideration of the testimony and exhibits introduced at trial, its observation of the witnesses and assessment of their credibility, the court enters the following orders: CT Page 12721
1. The marriage of the parties is hereby dissolved on grounds of irretrievable breakdown.
2. The parties shall have joint legal custody of the three minor children, and their principal place of residence shall be with the defendant. The parties shall consult and confer with each other regularly and share in making all major decisions regarding the children's health, education, employment opportunities, welfare and upbringing, with a view to arriving at a harmonious policy calculated to promote the best interests of the children. No major decisions as to such shall be made (except in case of emergency) without consulting the other parent. Each party shall take into consideration the need of the other party to be informed as to the children's whereabouts.
3. The plaintiff shall have visitation with the three minor children as follows:
 a. Overnight visitation on the first and third weekends of each month, from Friday evening at 6:00 p. m. to Sunday at 5:30 p. m., and on the second and fourth weekends of each month from Friday at 6:00 p. m. to Sunday at 1:00 p. m. The plaintiff shall make flight arrangements to accommodate these times, but visitation shall not be denied if his arrival or departure is delayed through no fault of his own.
 b. In the event that Monday is not a school day, the plaintiff shall have the option of returning the children at 9:00 a.m. Monday morning, subject to the plaintiff's ability to stay overnight.
 c. Five weeks summer vacation, beginning on July 5 and extending for five continuous weeks thereafter. During this summer vacation visitation the defendant shall have a weekend schedule with the children the same as the plaintiff enjoys during the remainder of the year.
 d. The following specific schedule for holidays and special days shall preempt the foregoing schedule: (a) School mid-winter vacation (February) will be spent with defendant in even-numbered CT Page 12722 years and with plaintiff in odd-numbered years. Spring vacation (March-April) will be spent with defendant in odd-numbered years and plaintiff in even-numbered years; (b) Easter weekend will be spent with defendant in odd-numbered years and with plaintiff in even-numbered years; (c) Mother's Day from 8:00 a.m. until 8:00 p. m. will always be spent with defendant and Father's Day from 8:00 a.m. until 8:00 p. m. will always be spent with plaintiff; (d) The Memorial Day holiday, as celebrated on a Monday, shall be attached to the plaintiff's weekend, and the children shall remain with the plaintiff until 5:30 p. m.; (e) The Fourth of July shall always be considered the defendant's holiday, and the plaintiff shall not have parenting time with the children on that day; (f) The plaintiff shall always have Labor Day, as celebrated on a Monday, and it shall be attached to his weekend, and the children shall remain with him until 5:30 p. m.; (g) Columbus Day and the proceeding weekend from 4:00 p. m. Friday until 8:00 p. m. Monday will always be spent with plaintiff; (h) Thanksgiving Holiday shall constitute Wednesday, thirty (30) minutes after the close of school, until Friday at 6:00 p. m. and shall alternate between the parties so that the Thanksgiving holiday shall be with the defendant in even-numbered years and plaintiff in old-numbered years; (i) The Christmas holiday shall be defined as one-half hour after the close of school on the last day of school preceding Christmas to 6:00 p. m. on the evening proceeding the commencement of school in January. The available hours shall be split equally between the parties so that in the even years the plaintiff shall have the first half, and he shall have the second half in odd years. The defendant shall have the last half in even years and the first half in odd-numbered years. It is understood that during the period of this visitation the other party shall not have visitation rights. Odd years and even years shall be defined on the basis of Christmas day.
4. In the event that a dispute arises as to the visitation CT Page 12723 schedule or decision-making as to the children, the parties shall attempt to resolve such dispute by mutual agreement, and, if no agreement is achieved, the issue shall first be submitted to a third party agreed upon by the parties for mediation before submitting the issue to the Superior Court for binding resolution.
Whichever parent has the children shall make the children available for the receipt of telephone calls at reasonable hours of the day and night and shall not interfere with the other parent's phone contact.
The Defendant is not to relocate the children more than 50 miles from their current residences without at least 90 days prior notice to the plaintiff in order to permit a court to modify visitation accordingly.
In the event of the illness or personal injury of any of the children, the first parent to learn of such illness or injury shall notify the other immediately and each parent shall keep the other reasonably informed of the whereabouts and condition of such child. For the purposes of this paragraph, the word "illness" shall mean any sickness or ailment which requires the services of a medical practitioner. The word "injury" shall mean any injury which requires the services of a medical practitioner. During the illness or injury, the plaintiff shall have the right of reasonable visitation with such child in addition to the other rights provided herein. When a child is ill and with the plaintiff, he assumes responsibility to take the child to the doctor, and the same applies to defendant. In the event the other parent is unavailable to be informed, the supervising parent has full authorization to make medical decisions regarding the treatment of the child without need for a signed release from the other parent.
Each of the parents shall furnish the other copies of any reports from third persons concerning the health, education, or welfare of the children, including report cards or other correspondence from a child's school, within one (1) week after receipt thereof, and each shall have the right to require such reports from such third persons. There will be open and equal access by both parents with regard to educational information including report cards, school meetings, plays, lessons, etc., with school instructions to send all such information to both parents. CT Page 12724
The parties agree to notify each other seven days in advance of all out-of-state travel and supply an itinerary with means of contact.
5. The plaintiff shall pay to the defendant as unallocated alimony and child support the sum of $900 weekly. The plaintiffs obligation to pay alimony to the defendant shall continue until his death, her death or her remarriage.
6. The plaintiff shall maintain a decreasing life insurance policy on his life to guarantee the outstanding balance of the support payments provided herein. The policy(ies) shall be in the original amount of $400,000. The defendant shall be named as the primary irrevocable beneficiary, with the children named as the secondary irrevocable beneficiaries until each child attains the age of 22 years. Annually the plaintiff shall provide to the defendant satisfactory proof that the life insurance remains in effect, and that the minor children and she are named as irrevocable beneficiaries.
7. The plaintiff will continue to provide comprehensive health insurance coverage for the benefit of the minor children as available to him through his employment or otherwise, for the maximum period of their eligibility and shall be solely responsible for any premium cost. The parties shall share equally in any unreimbursed or uninsured medical expenses of any kind whatever. The plaintiff shall provide health insurance coverage for the defendant on his group plan pursuant to COBRA for 36 months at the defendant's cost.
8. Within 30 days of this date counsel for the defendant shall disburse to her all of the funds he is presently holding in escrow as the proceeds of the sale of the parties' Elcy Way property.
9. Upon the sale of the Florida condominium jointly owned by the parties, the defendant shall have all of the proceeds of that sale after the payment of commission and other usual costs of sale.
10. Within 30 days of the date of dissolution the plaintiff shall take whatever action necessary to transfer to the defendant all of the funds in the Schwab Money Market Accounts.
11. By way of a Qualified Domestic Relations Order or other CT Page 12725 vehicle intended to eliminate or minimize tax liability, the plaintiff shall transfer to the defendant from the Travelers 401K, Equicor 401K, Schwab IRA's and/or First Interstate Bank IRA, at his election, the sum of $115,731. The parties shall be equally responsible for any tax liability which may arise from this transfer. The court retains jurisdiction to make additional or alternate orders to effectuate the property distribution ordered herein.
12. Except as otherwise affected by these orders, each party shall retain all of the assets shown on his and her financial affidavits of August 11, 1997 without any claim by the other party. Likewise, each party shall be responsible for the liabilities shown on his and her respective financial affidavits without any contribution of the other party and shall save harmless and indemnify the other party from any liability thereon.
13. The plaintiff shall pay to the defendant as a contribution to her counsel fees the sum of $25,000 within 60 days of the date of the dissolution.
14. The plaintiff shall have the federal and state tax exemptions for the three minor children. The parties shall exchange tax returns by April 15 of each year, commencing in 1998.
SHORTALL, J.